Joseph **FRANZA**, Plaintiff–Appellant, Cross–Appellee,

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 671 and Thomas Robidoux,** Defendants–Appellees, Cross–Appellants.

No. 193, Docket 88–7258.

United States Court of Appeals, Second Circuit.

Argued Oct. 21, 1988.

Decided Feb. 14, 1989.

Paul Alan Levy, Washington, D.C. (Alan B. Morrison, Arthur L. Fox, II, Public Citizen Litigation Group, Washington, D.C.; Leon Rosenblatt, West Hartford, Conn., of counsel), for plaintiff-appellant, cross-appellee.

Gregg D. Adler, Hartford, Conn. (Susan Price–Livingston, Kestell, Pogue & Gould, Hartford, Conn., of counsel), for defendants-appellees, cross-appellants.

Before CARDAMONE and PIERCE, Circuit Judges, and RAGGI, District Judge.*

CARDAMONE, Circuit Judge:

This appeal presents the difficult question of whether appellant Joseph Franza's discharge from employment with a health services plan by appellee Thomas Robidoux, a union official who served as Chairman of the Plan, violated Franza's rights under Title I of the Labor–Management Reporting and Disclosure Act (LMRDA or the Act), 29 U.S.C. §§ 411–415 (1982). After a jury trial on the merits in the United States District Court for the District of Connecticut, Judge Nevas held as a matter of law that because Franza could show neither evidence of a scheme by union officials to suppress rank and file dissent, nor a direct infringement of his Title I rights, he had failed to establish a cognizable Title I claim. *Franza v. International Bd. of Teamsters Local 671*, 680 F.Supp. 496, 503 (D.Conn.1988). In affirming the district court's judgment it is necessary to construe the "Bill of Rights" established under Title I. As will be seen in the following discussion, these rights are not unalienable; instead, their enforcement depends upon judicial adjustment of those conflicting values that were recognized by Congress when it enacted the LMRDA.

## I FACTS

In December 1981, prior to becoming a member of appellee International Brotherhood of Teamsters Local 671 (Local 671 or Union), Franza took a position as a field auditor for Local 671's Health Services and Insurance Plan (Plan). He was hired by Richard Robidoux who, by virtue of his elected position as Secretary–Treasurer of the Local, was the Union's principal executive officer, and was also the Chairman of the Plan's Board of Trustees. The Plan administers several welfare and health insurance programs on behalf of the members of Local 671. Four trustees serve on

the Board, two are representatives of the various employer-contributors to the Plan, and two are representatives of the Union. The Plan is subject to the fiduciary requirements of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1101–1114 (1982 & Supp. IV 1986). At the time that the events giving rise to this litigation occurred, Franza was both a Plan employee and a union member.

His duties as a Plan employee were varied. Although his job title was field auditor, Franza testified that he was also a "fund agent," which gave him access to certain employer records. Typically, he performed tasks such as picking up and sorting mail addressed to both the Plan and the Local, separating and depositing those checks addressed to the Plan, and conducting field audits, that is, reviewing the records of employer contributions to ensure that a proper contribution had been made. He also conducted individual audits for union members who had problems regarding their pensions. A fair reading of Franza's testimony reveals that he held a subordinate position, carried out Richard Robidoux's orders, and performed a variety of administrative tasks.

Appellees attempt to portray appellant as a policy-making employee of the Plan and confidante of Richard Robidoux, whose duties involved Union and Plan business. They point out that he continuously interacted with union officials and business agents, accompanied Local 671 agents to companies whose workforces the Local represented, delivered and picked up documents for the Union at the NLRB, and ran many errands for Secretary–Treasurer and Plan Chairman Richard Robidoux. In particular, appellees emphasize that despite his formal affiliation with the Plan and his title as a field auditor, Franza's work was closely related to the business of Local 671, and note that he was the Plan's sole union-member employee.

In the fall of 1985 the Local held its triennial elections and, as might be expect-

---

* Hon. Reena Raggi, United States District Court for the Eastern District of New York, sitting by designation.

ed, Franza campaigned openly for the re-election of Richard Robidoux, the Local's 15–year incumbent Secretary–Treasurer. Robidoux's opponent in the election was his cousin, Thomas Robidoux, who headed what appellees describe as a "reform slate." During the election questions were raised concerning the propriety of Franza's employment by the Plan. Thomas Robidoux won the election, thereby terminating his cousin's long term tenure with the Local and as Chairman of the Plan's Board of Trustees. When, on December 23, 1985, Thomas Robidoux took office, he fired appellant.

## II  PRIOR PROCEEDINGS

One avenue of relief available to Franza for this loss of his employment was through administrative channels. Initially, he sought such relief against appellees, Local 671 and Thomas Robidoux, from the National Labor Relations Board alleging that his retaliatory discharge constituted a violation of § 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1982), and was an unfair labor practice under §§ 8(b)(1)(A) and 8(b)(2), 29 U.S.C. §§ 158(b)(1)(A), 158(b)(2) (1982). Because Thomas Robidoux's decision may have been privileged under Board precedent, and because Franza might have been subject to termination on account of his work record in any event, the Board's Regional Office found his claims to be without merit and refused to issue a complaint on his behalf.

Since the administrative route proved fruitless, Franza brought the instant action in the District of Connecticut against the same appellees alleging that he was terminated in retaliation for his support of Richard Robidoux in violation of the equal rights and free speech provisions of §§ 101(a)(1) and 101(a)(2) of Title I of the LMRDA, 29 U.S.C. §§ 411(a)(1) and 411(a)(2) (1982). Specifically Franza argued that although he retained his union membership and could attend meetings, such an employment-related reprisal chilled his and other union members' exercise of

their statutory rights to express their views and to vote and participate in union elections and meetings. He also alleged that his termination—in addition to infringing his rights as a union member—was part of a pattern to suppress dissent and purge from the union those who did not support the election of Thomas Robidoux.

Local 671 and Robidoux counterclaimed, contending that Franza's employment violated the governing provisions of the Plan because he was not qualified to perform the duties of the office and merely performed personal services for Richard Robidoux. They argued further that Robidoux's fiduciary responsibilities to the Plan under ERISA required that he discharge Franza.

At a trial on the merits the jury was asked to answer six special interrogatories. The jury answered only one in the affirmative, namely, that Franza had shown by a preponderance of the evidence that he had been retaliated against because of his support for Richard Robidoux in the election. The district court nonetheless ruled that appellant had failed to state a cause of action cognizable under Title I of the LMRDA. *See* 680 F.Supp. at 504. The trial court held that because Franza remained free to participate in union affairs and to criticize the union leadership and policies, his rights were not "infringed" within the meaning of Title I or controlling precedents. *Id.* at 503. Moreover, it accepted the jury's finding that Franza's termination was not part of a scheme to suppress dissent. *Id.* at 503 n. 7. Because we affirm the judgment of the district court on Title I grounds, we need not reach or decide appellees' counterclaims.

## III  DISCUSSION

### A.  *Title I of the LMRDA*

We begin our analysis by examining briefly the language, history and purposes of the LMRDA and Title I. Title I, entitled the Bill of Rights of Members of Labor Organizations [1] guarantees to "[e]very

1. SUBCHAPTER II—BILL OF RIGHTS OF  MEMBERS OF LABOR ORGANIZATIONS

member of a labor organization" equal rights to nominate candidates, vote in elections, attend meetings and participate in union affairs, § 101(a)(1), 29 U.S.C. § 411(a)(1), as well as the right to meet, assemble and to "express any views" concerning candidates and union policies. Section 101(a)(2), 29 U.S.C. § 411(a)(2). Section 102 of the Act provides that "[a]ny person whose rights secured [by Title I] have been infringed" may bring a civil action in federal district court where the alleged violation occurred. 29 U.S.C. § 412.

The principal reason for the enactment of the LMRDA was to correct widespread abuses of power and instances of corruption by union officials, and to encourage democratic self-governance in unions. *See* S.Rep. No. 187, 86th Cong., 1st Sess. 7–8 (1959), *reprinted in* 1959 U.S.Code Cong. & Admin. News 2318, 2323. As originally introduced in the Senate, the LMRDA only contained what are now Titles II through VI, which establish disclosure requirements and rules governing union trusteeships and elections. *See* S.Rep. No. 1555, 86th Cong., 1st Sess. 1 (1959), *reprinted in* 1 NLRB, *Legislative History of the Labor–Management Reporting and Disclosure Act of 1959*, 338–96 (1959) (Leg. Hist.); *see also* 29 U.S.C. §§ 431–441 (disclosure requirements); §§ 461–466 (trusteeships); §§ 481–483 (election procedures).

As a result, Title I was hastily written on the floor to mollify fears that the bill before the Senate inadequately protected union members from abusive or coercive leadership practices. The first Title I—the McClellan amendment—painted the union members' "Bill of Rights" broadly and gained Senate approval by a single vote. *See* 105 Cong.Rec. S6492 (daily ed. Apr. 22, 1959), *reprinted in* 2 Leg.Hist. 1119. A later amendment was introduced by Senator Kuchel, to eliminate "the extremes raised by the [McClellan] amendment," 105 Cong.Rec. S6025 (daily ed. Apr. 25, 1959), *reprinted in* 2 Leg.Hist. 1234 (statement of Sen. Cooper, co-sponsor), and to ensure that Title I would not "unduly harass and obstruct legitimate unionism." 105 Cong. Rec. S6024 (daily ed. Apr. 25, 1959), *reprinted in* 2 Leg.Hist. 1233 (statement of Sen. Church). It was adopted by a vote of 77–14 and ultimately became Title I. *See* 105 Cong.Rec. S6020–30 (daily ed. Apr. 25, 1959), *reprinted in* 2 Leg.Hist. 1229–39.

The cause of action provided in § 102 must similarly be read in light of its legislative history. *See* Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 Mich.L.Rev. 819, 852 (1960). Title I clearly evinces an interest in assuring union democracy by protecting individual union members' rights. But the institutional interest in union self-governance— free of undue government oversight or interference—sometimes outweighs the free speech rights of union members. *See United States v. Sadlowski*, 457 U.S. 102, 112, 102 S.Ct. 2339, 2346, 72 L.Ed.2d 707 (1982).

### B. Judicial Construction of Title I

We next consider judicial construction of Title I. The Supreme Court's most illuminating pronouncement on this Act is *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867,

§ 411. Bill of rights; constitution and bylaws of labor organizations

(a)(1) Equal rights

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

72 L.Ed.2d 239 (1982). In *Finnegan* the Court rejected a claim brought under §§ 101(a)(1),(2) and 102 by appointed union business agents whose employment with the union has been terminated after they had supported the losing candidate in a hotly-contested union election. *Id.* at 441–42, 102 S.Ct. at 1873–74. Upon examining the language and legislative history of the Act, the Court emphasized that the LMRDA was meant to protect *union members' rights as members*, not an individual member's right to employment with the union. *Id.* at 439–41 & n. 10, 102 S.Ct. at 1872–73 & n. 10. It observed that Title I does not bar removal of policymaking union officials because such removal was "only an *indirect* interference with their membership rights." *Id.* at 440, 102 S.Ct. at 1873 (emphasis in original). The overriding purpose of promoting union democracy and political accountability established by the Act would be thwarted were an elected union leader unable to "choose a staff whose views are compatible with his own." *Id.* at 441, 102 S.Ct. at 1873. In declining to construe the precise scope of Title I's guarantees, the Supreme Court expressly left open whether Title I prohibited removal of nonpolicymaking union employees. *See id.* at 441 n. 11, 102 S.Ct. at 1873 n. 11; *see also id.* at 443, 102 S.Ct. at 1874 (Blackmun, J., concurring).

In *Cotter v. Owens*, 753 F.2d 223 (2d Cir.1985), we considered the implications of *Finnegan*. In that case a union member alleged that his removal from the Local's nuclear safety committee was in retaliation for his dissident activities, and was therefore violative of his § 101(a)(2) free speech rights. Cotter argued that since he was a nonpolicymaking employee his rights were directly infringed, and that he was entitled to employment protection under *Finnegan's* "exception" for nonpolicymaking union employee-members. *See id.* at 227. We were unpersuaded by this argument and held that even assuming the existence of such an exception, relief under Title I was limited to discharges in which dismissal directly affected membership rights. *Id.* at 228. Beyond that, because Cotter was found to be in a policymaking position

as part of the Local's nuclear safety committee, *Finnegan* expressly barred relief under Title I. *Id.*

*Cotter* went on further to recognize that a union official may become a symbol for a movement within the rank and file of union members, and that discipline of that person could be considered threatening to the exercise of Title I rights by union members generally. *Id.* at 229. In such cases—rare though they may be—the question is whether an action against the official is merely an isolated act of retaliation for political disloyalty or is instead part of a purposeful and deliberate attempt to suppress dissent within the union. *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir.1973). *See also Johnson v. Kay*, 860 F.2d 529, 536 (2d Cir.1988) (finding a purposeful attempt by union officials to suppress dissent). A litigant states a cognizable Title I claim when he demonstrates upon clear and convincing evidence that dismissal was part of a scheme to suppress dissent. *Cotter*, 753 F.2d at 229; *Newman v. Local 1101, Communications Workers*, 570 F.2d 439, 445–46 (2d Cir.1978).

### C. Appellant's Arguments

We turn now to the arguments appellant advances to support his claim that his discharge from union employment states a viable Title I cause of action. In order to establish his claim against appellees, Franza makes several arguments respecting *Finnegan* and *Cotter*, and his own status as an employee of the Plan.

First, he asserts that Title I was designed generally to preclude retaliatory discharge for the exercise of protected rights, suggesting that *Finnegan* is itself an exception necessary to promote union democracy. Next, he attempts to distinguish *Finnegan* and *Cotter*. Finally, Franza argues that ERISA draws a bright line between unions and their benefit plans, and forbids Plan trustees from making decisions based on union politics.

### D. Analysis of Appellant's Contention

■ We dispose of Franza's last contention first. We agree that ERISA carefully

distinguishes the fiduciary duties of Plan trustees from their obligations as union officials. *Cf. Donovan v. Bierwirth*, 680 F.2d 263, 272–73 (2d Cir.) (plan trustees who simultaneously served as corporate officers during takeover bid breached fiduciary duties), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). To appellant's argument that he may not be discharged from plan employment because of union politics, it is sufficient to reply that his field auditor position was unrelated to his union membership status in Local 671. There was no requirement that Plan employees be members of the Union. As we note below, the test under Title I is whether membership rights in the union were directly infringed by action taken with respect to the union member's employment status. Consequently, employment status and union membership rights must be demonstrably related to one another. Here, because there is no nexus between Franza's status as a Plan employee and his status as a Union member of Local 671 his claim that his discharge contravened the Plan Trustees' fiduciary duties is without merit.

We analyze Franza's first two claims together in the context of the purposes of the LMRDA and its judicial construction. The linchpin of Franza's argument is his view of the scope of *Finnegan* and *Cotter*. As noted, he treats *Finnegan* as an exception to the general rule against discharge in retaliation for the exercise of Title I rights. He argues that the two decisions do not require alteration or diminution of some specific membership right, or of a member's status as a member. Rather, he believes these cases should be read as providing Title I relief when the exercise of rights incident to union membership is discouraged.

Factually, those cases concerned the dismissal of policy-making employees of the union, he says, while he was not a union employee, and did not hold a policymaking position with the Plan. Appellant argues that the distinction between policymaking union employees and those who are not is grounded on the union's rightful interest in administrative efficiency. Therefore, his

argument continues, only those officials whose dissent could impede implementation of the elected leaders' policies should be excluded from the protection of Title I. With respect to policy differences, appellant contends that the institutional interest in union democracy and political accountability—so central to the rationale in *Finnegan*—is absent here. He urges that his retaliatory discharge by Thomas Robidoux not be condoned as an exercise of union democracy.

Appellant's argument has the merit of logic, and is analogous to the protection accorded nonpolicymaking public employees who claim their discharge resulted from the exercise of their First Amendment rights. *See Branti v. Finkel*, 445 U.S. 507, 516–17, 100 S.Ct. 1287, 1293–94, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 359, 96 S.Ct. 2673, 2682–83, 49 L.Ed.2d 547 (1976) (plurality opinion); *see also Lieberman v. Reisman*, 857 F.2d 896 (2d Cir.1988) (unfavorable patronage actions as well as discharges are protected by *Elrod*). Yet, for several reasons we are unpersuaded.

■ First, the proposition that *Finnegan* is an exception to Title I is not well founded. The issue of "rights" before the Supreme Court in *Finnegan* and before us in the instant case do not implicate those fundamental First Amendment guarantees whose protections apply to all citizens, and which are relied upon to safeguard the rights of public employees in their jobs. *See Elrod*, 427 U.S. at 357, 96 S.Ct. at 2681–82. Instead, the rights relied upon by appellant are those granted by an Act of Congress aimed at protecting a finite group, that is, members of labor organizations. As noted, earlier, Senator Kuchel's substitute for the McClellan Amendment became the Title I Bill of Rights. Significantly, that substitute contains the proviso found in § 101(a)(2) that nothing in the Bill of Rights "shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with

its performance of its legal or contractual obligations."

The Kuchel substitute was introduced not only to avoid the extremes of the McClellan Amendment, but also so as not to unduly harass legitimate unionism. *See Sadlowski*, 457 U.S. at 110, 102 S.Ct. at 2345; *Dolan v. Transp. Workers Union*, 746 F.2d 733, 740 (11th Cir.1984). The statute aims to substitute a more democratic union for the autocratic union boss. It posits a basic First Amendment value, an undeniably worthwhile objective. But the proviso in § 101(a)(2) makes clear that Congress' emphasis on a basic value did not express a purpose to make Title I coextensive to the First Amendment. *Sadlowski*, 457 U.S. at 111, 102 S.Ct. at 2345. We read *Finnegan*, therefore, as a judicial attempt to advance democratic values in the conduct of union affairs without unduly interfering with union governance. As such, *Finnegan* is not an exception to the Title I rule. It is the rule, and we must apply it.

■ We now turn to appellant's contention that his employment status was of a nonpolicymaking employee. Even though the district court made no finding with respect to whether Franza was in a policymaking position, we assume that he was not because this seems evident from the duties he performed for the Plan. The assumption that Franza is a nonpolicymaking employee directly confronts the question expressly left open in *Finnegan*, 456 U.S. at 441 n. 11, 102 S.Ct. at 1873 n. 11. An individual's obvious interest in joining a union is to promote his or her secure employment. In this case, that employment was by the Plan over which union leaders had some control by virtue of their representation on the Board and because the elected Secretary–Treasurer of the Union was also the Chairman of the Board of Trustees of the Plan. We recognize that the underlying rationale in *Finnegan* of encouraging union democracy and political accountability is not squarely implicated here. At the same time, *Finnegan* teaches that it is not a member's *employment by the union* that is protected by Title I; rather it is his *membership in the union*

that is safeguarded. Were it otherwise, § 102 would be transformed into a genie offering lifetime job security because Title I rights would be backed by a right to bring an action for any loss of union employment.

Moreover, to adopt appellant's view would effectively ignore the fact that courts considering Title I claims have required that the challenged action directly affect or alter the union member's rights *qua* member. *See Finnegan*, 456 U.S. at 438, 102 S.Ct. at 1871; *Cotter*, 753 F.2d at 228. *See also Brett v. Hotel, Motel, Restaurant, Constr. Camp Employees & Bartenders Union, Local 879*, 828 F.2d 1409, 1413–16 & n. 11 (9th Cir.1987); *Lynn v. Sheet Metal Workers Int'l Ass'n and Local No. 75*, 804 F.2d 1472, 1478 (9th Cir. 1986), *aff'd*, —— U.S. ——, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989); *Adams–Lundy v. Association of Professional Flight Attendants*, 731 F.2d 1154, 1158–59 (5th Cir. 1984). Thus, as noted, *Finnegan* and *Cotter* hold that because Congress was unwilling to intrude into the internal affairs of unions, Title I claims are limited to those "directly affecting [union] membership rights." *Cotter*, 753 F.2d at 228. Claims of discharged union employees will not be upheld when based upon "only an *indirect* interference with their membership rights...." *Finnegan*, 456 U.S. at 440, 102 S.Ct. at 1873 (emphasis in original).

Direct interference with Title I rights is required to state a cognizable § 102 claim. *See Brett*, 828 F.2d at 1415 (9th Cir.1986); *Murphy v. Intern. Union of Operating Engineers*, 774 F.2d 114, 122–23 (6th Cir. 1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986); *Adams–Lundy*, 731 F.2d at 1158–59 (5th Cir.1984). In *Murphy*, for example, a union member alleged that union officials had maintained an ongoing policy of denying certain dissident members job opportunities through manipulation of the Local's job referral system. *See* 774 F.2d at 118. *Murphy* held that such discrimination was a direct infringement of the member's equality rights under § 101(a)(1) and free expression rights under § 101(a)(2). *See id.* at 123. An equal right to jobs allocated by

the union referral system is clearly an incident of union membership. Physical intimidation and violence actually prevented union member Murphy from attending certain meetings, which was actionable as a direct infringement of a membership right. *See id.* at 126. Other employment-related reprisals have been held actionable under § 102 because they impinged on union members' Title I rights. *See Duncan v. Peninsula Shipbuilders Ass'n.*, 394 F.2d 237, 239 (4th Cir.1968) (dissident member unlawfully disciplined by employer discharging him because of union pressure which also resulted in loss of union membership). *Vandeventer v. Local Union 513*, 579 F.2d 1373 (8th Cir.) (manipulation of union-administered work list), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

### E. Resolution of Instant Case

The present posture of the law is that members of labor organizations are protected under Title I of the LMRDA in their rights to participate in union affairs without fear of reprisal. The power granted to federal courts to uphold a member's Title I rights has been circumscribed by Congress which, at the same time it created members' rights, reaffirmed the basic tenet that absent an abuse of power that directly infringes a member's rights, unions should be self-governing, free from judicial oversight. As a consequence, the thrust of decisional law is that a direct infringement of membership rights or a real threat to the democratic integrity of the union is required to state a claim cognizable under § 102 of the Act. The rights enumerated in § 101 do not serve as job security provisions; instead, they strengthen union democracy by making direct interference actionable. *See Brett*, 828 F.2d at 1415–16 n. 11: *Lynn*, 804 F.2d at 1478 & n. 4; *Murphy*, 774 F.2d at 123; *Adams–Lundy*, 731 F.2d at 1159; *Crowley v. Local 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers*, 679 F.2d 978, 990–91 (1st Cir.1982), *rev'd on other grounds*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984).

The Supreme Court's recent decision in *Sheet Metal Workers' Int'l Ass'n v. Lynn*, —— U.S. ——, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989), *aff'g* 804 F.2d 1472 (9th Cir. 1986), only reinforces our decision here. The Court in *Lynn* held that removal of an elected union business agent in retaliation for statements in opposition to a proposed dues increase stated a cause of action under § 101(a)(2). *Id.* at ——, 109 S.Ct. at 644–45. The Court focused, as we do here, on the democratic integrity of the union and the basic purposes of the LMRDA. *Id.* at ——, 109 S.Ct. at 644–45. In contrast to the removal of an appointed employee of a benefit plan, removal of the elected official so chilled the official's free speech rights as a union member, as well as other union members' rights, as to warrant LMRDA protection. *Id.* at ——, 109 S.Ct. at 645.

Requiring a nexus between a union member's employment rights and membership rights fully reflects Congress' objectives of noninterference in internal union affairs while ensuring that union affairs are conducted in accordance with basic democratic principles. Here, where Franza's status as a member is unrelated to his employment by the Plan, his loss of that employment is not the infringement of a right to which Title I's protections attach. Hence, the test is not whether the employee is or is not in a policymaking position, rather the question is whether membership rights in the union were directly infringed by action taken with respect to a union member's employment status.

## IV  CONCLUSION

In this case Franza's union membership rights remain unaffected by his loss of employment. Appellant retains all the rights of union membership, and has not been prevented from exercising them. Nor does the evidence support an inference that his discharge discouraged him from exercising those membership rights. Moreover, to whatever extent his union member's rights of free speech have been chilled, no similar threat to the democratic processes of Local 671 can be discerned. As noted, a purposeful scheme to suppress dissent

must be demonstrated by "clear and convincing evidence." Here the jury made no finding of a deliberate attempt to suppress dissent. *Franza*, 680 F.Supp. at 503 n. 7. The Union rank and file voted for new leadership, strongly opposed to a 15–year incumbent with whom appellant was closely identified. It is that political activity—not his union activities—that caused Franza's discharge from Plan employment.

Accordingly, the judgment appealed from is affirmed.