Anthony RUMORE, Plaintiff,

v.

Aaron BELK, Defendant.

Civ. A. No. 95–0672(RCL).

United States District Court,
District of Columbia.

Nov. 27, 1995.

William Joseph Rodgers, Collier, Shannon, Rill, & Scott, Washington, DC, for Plaintiff.

Earl Vincent Brown, Jr., International Brotherhood of Teamsters, Washington, DC, for Defendant.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on defendant's motion for summary judgment. Plaintiff, Anthony Rumore, brought this action alleging that defendant Aaron Belk violated his rights to free speech and assembly under Title I of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C.A. § 401–531 (1985). Although no discovery has taken place, in light of the affidavits submitted by both parties, the court shall grant defendant's motion for summary judgment, finding that defendant's actions did not impinge upon plaintiff's free speech rights.

## I.

### BACKGROUND

The present action arises out of the apparently intractable conflict between the current leadership of the International Brotherhood of Teamsters ("IBT") and its affiliated entities. Plaintiff in this case, Anthony Rumore, is a member of the IBT and the Soft Drink and Brewery Workers Union, Local 812. Additionally, he is president of the IBT Joint Council Number 16. Joint Council 16 is an intermediate governing body within the IBT, and it is comprised of some 59 IBT locals in and around New York City. Defendant Belk, also a member of the IBT, is the Vice President of the IBT and the Executive Assistant to the IBT General President, Ron Carey.

This dispute arises over the issue of trusteeships imposed on locals by the IBT leadership. Following a consent decree that settled a RICO case brought by the federal

government against the IBT in 1988, the IBT leadership was expressly empowered with the ability to impose a trusteeship over subordinate locals in order to "decriminalize" them. Pursuant to the imposition of a trusteeship, the IBT has the ability to appoint a trustee to temporarily run the affairs of the subordinate entity, and that trustee can impose the appropriate discipline on local members. The Independent Review Board ("IRB"), also established by the Consent Decree, oversees the imposition of trusts.[1] Naturally, locals tend to resist the imposition of trusteeships.

Prior to the events of this suit, the IBT imposed trusteeships on some of the locals of Joint Counsel 16 as a result of IRB recommendations. Plaintiff and other members of Joint Council 16 believe that the trusteeships were politically motivated. In a few instances, officers of other trusteed locals and subordinate IBT entities have challenged the trusteeships in court; none of these challenges has been successful.[2]

The instant action arose in the spring of 1995. In January of that year, Joint Council 16 decided to conduct an "educational seminar" for its local unions on the issue of trusteeships. On January 24, 1995, plaintiff Rumore sent a letter to all of the principal officers of the local unions within Joint Council 16 via TITAN, the communications or e-mail network for the IBT. The letter stated as follows: [3]

> Prompted by a significant number of requests from local unions, Joint Council 16 will conduct an educational seminar on trusteeships. The speakers will include attorneys involved in litigation over trusteeships on both sides of the issues and trustees, as well as members who will describe their experiences under trusteeship. The speakers will attempt to take the terror and mystery out of the trusteeship

process by explaining the legal and constitutional grounds for trusteeship, how to challenge a trusteeship, and in general, how to avoid a trusteeship.

> . . . . .

> It is important that all local unions attend this meeting.

On February 27, 1995, defendant Belk responded to Rumore's letter via a Titan letter of his own. Belk sent copies of the letter to the same people to which Rumore had sent his message. Belk's response read as follows:

> Your Titan message of January 24, 1995, to all Joint Council 16 local unions represents an apparent attempt to interfere with the clean-up of corruption in the Teamsters Union.

> Since Ron Carey became General President, local unions in the New York area have been put in trusteeship for violations of the IBT Constitution such as organized crime ties, racketeering, and misuse of dues money and pension funds.

> I would think you would applaud the International Union's efforts to enforce the constitution and eliminate corruption. Instead, you call for a training session on how to challenge such trusteeships.

> Lawyers who receive union dues money apparently will come to your seminar to explain how to avoid a trusteeship. Dues money has been paid to lawyers to challenge many trusteeships established in the past three years. In each case, the courts have rejected those wasteful challenges to reform.

> At a time when working people are facing many difficult challenges, the dues money you are now about to waste on this training session would be better spent on training to maintain strong local unions that involve the membership. The Internation-

---

1. The current members of the IRB include: William Webster, former director of the FBI and CIA; Frederick Lacey, former United States Attorney and a federal district judge. *See United States v. IBT*, 12 F.3d 360, 362–63 (2d Cir.1993).

2. *See, e.g., International Bhd. of Teamsters v. Local 810*, 19 F.3d 786, 788 (2d Cir.1994); *International Bhd. of Teamsters v. Local 705*, 827 F.Supp. 513 (N.D.Ill.), *appeal dismissed*, Civ. No.

93–2789 (7th Cir.1993); *International Bhd. of Teamsters v. Garage Employees Local Union 272*, 1992 WL 235173, 1992 U.S. Dist. LEXIS 13455 (S.D.N.Y. Sept. 8, 1992).

3. Because of the importance of the content of the communications between Rumore and Belk, they are set out in full in this opinion.

al's education department assists interested locals with such training.

It sends the wrong signal to our members and our honest local union leaders when you give the impression that you plan to train officials on how to walk the fine line between permissible activity and corruption.

The way to avoid a trusteeship is to avoid unconstitutional and illegal activity. If any local union officer has questions about how to meet their obligations under our constitution, they need only contact the International union for assistance.

Your announcement states that trusteeships have created "terror" and "mystery." If you want to describe how a corrupt official feels when they have been caught as "terror," that is up to you. But the real terror in this union has been felt by members who were threatened, intimidated, or otherwise had their rights violated and their money misused by certain corrupt officials.

There is no "mystery" about trusteeships. They are invoked when our constitution has been violated and action is necessary to protect members' rights. To me, the only "mystery" is why someone would spend dues money to defend corruption instead of helping to eliminate it.

Following this letter, on March 1, 1995, Rumore responded to Belk via Titan:

Your Titan of February 27, which you sent to all Joint Council 16 locals mischaracterizes our educational seminar and places the International Union in the position of being opposed to having officers and members being informed of their rights under the law and the International Constitution. You also ignore the fact that we have invited as speakers the attorneys for the General President in these matters and a court-appointed trustee. As our notice of the seminar indicates, we intend to cover the very subject that you mention in your Titan, that is, how to avoid a trusteeship by complying with the law and the International Constitution.

As the General President's Executive Assistant, I can understand why you would oppose this opportunity for members and officers to learn about their rights. However, using members' dues money to educate and inform officers and members about their rights is clearly an appropriate expenditure of union funds. Apparently, you only approve of education where you control the curriculum and the teacher. However, you should understand that many members and officials feel very strongly that certain trusteeships have been politically-motivated and have targeted individuals who have exercised their Title I free speech rights. Given the events of recent days concerning the reports of trusteeships being planned for a number of local unions and joint councils, your Titan has had the effect of causing Teamster officials and members to realize that the threat is real. The response to our seminar has been so overwhelming that we have been forced to seek a larger auditorium to accommodate the individuals now seeking to participate in this educational seminar. . . . If you wish to have the benefit of other viewpoints on the exercise of the trusteeship authority by the General President, we would be happy to have you attend and would also invite you to speak if you like. Since I have become president of the Joint Council, we have encouraged open debate and lengthy discussions about issues facing the Great Union. You too should encourage, rather than attempt to chill, the exercise of free speech rights by our members and officers.

After receiving this response, Belk replied to Rumore on March 3, 1994, as follows:

Your letter response to me on Joint Council 16's "trusteeship seminar" raises more questions than it attempts to answer. Which specific Local Union trusteeships do you claim were "politically motivated" according to your opinion or others? Who specifically do you or others allege were targeted in a trusteeship because of the exercise of their Title I free speech rights? Finally, please produce the reports of planned trusteeships which you claim exist.

Following this exchange of correspondence, neither Belk, the IBT, nor any related

entity brought formal or informal charges against Rumore or anyone else in connection with the seminar.

Although Rumore held the seminar as planned, he avers that Belk's letters "seriously inhibited [ ] his ability to effectively and openly speak at the seminar." Pl.Mot. for Summ. J. at 17. He alleges that he had intended to make substantive remarks that were critical of trusteeships and the IBT. *Id.* at 18. However, "[t]he threats made by [defendant] had the effect of relegating Rumore to act only as a moderator of this seminar, ...." *Id.*

On April 6, 1995, plaintiff filed his complaint in this action. Rumore brings this suit in his personal capacity alleging that Belk's two letters constitute an effort to "threaten, intimidate, interfere with and restrain" Rumore and other unnamed union members from exercising free speech and assembly rights in violation of Title I of the LMRDA, section 101(a)(2). For relief, Rumore seeks compensatory and punitive damages for himself, a declaratory judgment and a permanent injunction to prevent Belk from violating any more free speech rights.

Defendants immediately filed a motion for summary judgment claiming that the letters fail, as a matter of law, to establish a cognizable claim under section 101(a)(2) of the LMRDA.

## II.

### LEGAL STANDARD

■ Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If summary judgment is to be denied, there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the non-moving party

"fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment may be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. Additionally, the Supreme Court has stated that conclusory and unsupported allegations, hearsay, or opinions cannot be used to create genuine issues of fact. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

The Supreme Court has also noted that the standard for summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), pursuant to which the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

## III.

### ANALYSIS

■ The Supreme Court explained that the primary objective of the free speech provisions of the LMRDA was to ensure that "unions would be democratically governed and responsive to the will of their memberships." *Finnegan v. Leu*, 456 U.S. 431, 436, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982); *see also Adams–Lundy v. Association of Professional Flight Attendants*, 731 F.2d 1154, 1156 (5th Cir.1984). To this end, section 101(a)(2) of the LMRDA provides:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express views, arguments, or opinions; ....

29 U.S.C.A. § 411(a)(2) (1985). These rights inure to all members of the union, including union leaders, *Adams–Lundy*, 731 F.2d at 1156.

### A. *The Legal Standard for the Chilling of Free Speech*

■ A union member can state a claim under section 101(a)(2) of the LMRDA by alleging that defendants threatened retaliation or discipline because of, or as a result of, the member's speech in order to stifle or chill

further speech. *Adams–Lundy*, 731 F.2d at 1158–59 ("A plaintiff should not have his complaint dismissed ... if it might support a claim that his firing was part of a pattern of intimidation and stifled dissent."). In other words, a member can state a claim by showing that the threats or actions were part of an overall plan to suppress speech throughout the union. *Id.* The *Adams–Lundy* court described the cause of action in the following manner:

> Sometimes, ... one group or faction within a union may become so entrenched and despotic that the democratic character of the union is threatened. When this happens, and when the dominant group strives to stifle dissent and efforts at reform within the union, the rights of union members to belong to an open democratic labor organization are infringed.

*Id.* at 1158.

■ In order to sustain his claim that Belk's letter was part of an overall plan to suppress dissent in the Teamsters, plaintiff must first show that he has been threatened or actually retaliated against because of, or as a result of his speech. *See Sheet Metal Workers' v. Lynn*, 488 U.S. 347, 354, 109 S.Ct. 639, 644, 102 L.Ed.2d 700 (1989). Then, Rumore must provide clear and convincing evidence that the IBT action was "part of a deliberate attempt by union officials to suppress dissent within the union." *Newman v. Local 1101, Communications Wkrs.*, 570 F.2d 439, 445–46 (2d Cir.1978) (*quoting Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir.1973)); *accord Franza v. International Bhd. of Teamsters, Local 671*, 869 F.2d 41, 45 (2d Cir.1989) ("A litigant states a cognizable Title I claim when he demonstrates upon clear and convincing evidence that dismissal was part of a scheme to suppress dissent."); *Cotter v. Owens*, 753 F.2d 223, 229 (2d Cir.1985).[4]

■ However, union members cannot use the LMRDA as a mechanism to attack political opponents. "'We by no means suggest ... that the free speech rights of union

members are threatened or infringed upon every time a political dispute occurs in a union and the dissident members interpret some action by union officials as a threat.'" *Newman*, 570 F.2d at 445 (*quoting Schonfeld*, 477 F.2d at 903). Upon examination of Belk's letters in light of these principles, the court cannot agree with plaintiff that the letters constitute a threat of retaliation within the meaning of the LMRDA. To the contrary, the court finds that the only reasonable conclusion that can be drawn from the letters is that they do not contain a threat of retaliation. Therefore, because plaintiff cannot show that defendant retaliated or threatened to retaliate against him for his speech, the letters cannot be part of an overall scheme to suppress dissent within the Teamsters, and summary judgment shall be granted. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

### B. *Defendant Belk's Letters*

Courts proceeding under plaintiff's theory require a tangible and identifiable threat or retaliatory action to form the basis of the claim. For example, the court in *Adams–Lundy* reached the question of whether defendants had engaged in a plan to suppress dissent only after finding that plaintiff had suffered tangible retaliation, that is, removal from the union governing board. 731 F.2d at 1156, 1158–59. Similarly, in *Schonfeld v. Penza*, defendants removed Schonfeld from office and barred him from holding any office for five years. 477 F.2d at 903. This discipline raised "the question whether the sanctions on Schonfeld in the peculiar context of the history of union factionalism presented here impede[d] or infringe[d] upon the free speech and association rights of union members...." *Id.* In *Newman v. Local 1101*, the court found that the defendant union removed plaintiff from his position as shop steward in response to his speech. 570 F.2d at 443. This was tangible and identifiable retaliation.

---

4. The plaintiff argues that he need only show that the threats *either* were part of a deliberate attempt to suppress speech *or* that the effect of the threats was to suppress speech. However, the

court does not reach this question because, as discussed below, the court finds that plaintiff's cause of action fails as Belk's letters did not contain a threat.

These cases reinforce the obvious necessity of a real, as opposed to an imaginary or improperly inferred, threat of retaliation. Belk's letters, in contrast to the cases discussed, do not contain a real or implied threat of discipline or retaliation. Plaintiff cannot point to any language that indicates that Belk intended to threaten disciplinary action or retaliation of the sort that would chill his free speech.

The court set out the full text of the letters above in order to emphasize that plaintiff's allegations are without merit. First, the letters do not contain any explicit threats of discipline or action as a result plaintiff's speech, nor do the letters contain explicit threats of discipline or action in the event that plaintiff holds the seminar. Understandably, Belk supports trusteeships and sees legal challenges as wasteful. These letters voice that opinion. Moreover, the court finds that the letters are devoid of any recognizable implicit threats. In his letters, Belk voiced his reaction and opinion concerning the subject of the seminar. However, as a reading of the letters indicates, Belk made no subtle indications that holding the conference will subject participants to discipline or negative action. The letters indicate a fundamentally different political ideology, yet they amount to little more than that. The court finds that the only reasonable conclusion that may be drawn from the letters is that they do not contain threats, express or implied, that would chill the exercise of free speech.

Plaintiff argues that the case of *Guzman v. Bevona*, 1995 WL 110584 (S.D.N.Y. Mar. 15, 1995), commands a different result. In that case, the court declined to grant summary judgment in favor of the union when plaintiff claimed that the following portion of a letter written to the plaintiff chilled his free speech:

> You have the right to express your opinion with respect to these matters but you should confine your factual statements to the truth. Dissemination of false informa-

tion will make you vulnerable to legal action by the Union and its officers.

*Id.* at *4. The court first held that threats of legal action, rather than union discipline, are not actionable under the LMRDA. *Id.* However, the court would not grant summary judgment for defendants because the court found a material issue as to whether this particular plaintiff, uneducated in the law, may have thought that the letter threatened him with union discipline. *Id.* As the text of the letter indicates, it is nothing like Belk's letters. There is no question that the letter in *Guzman* contains a threat of action. Rumore cannot avoid summary judgment by claiming that there is a material factual question as to whether he thought that Belk's letters contained threats of discipline or retaliation because the letters are devoid of any sort of threat. *Guzman*, a district court case, would require a denial of summary judgment when the issue turns not upon whether there is a threat, but whether the member perceived the threat as one that the LMRDA prohibits. Belk's letters simply do not contain any threats.

■ The court's conclusion is reinforced by the plaintiff himself. In Rumore's response to Belk's February 27, 1995, Titan letter, Rumore indicates that he was far from chilled in his speech activities. Rumore first set out to rebut all of Belk's opinions. He then made the accusation that many of the trusteeships imposed on locals within Joint Council 16 were politically motivated. Rumore went so far as to invite Belk to participate and speak at the seminar to voice his views. The letter goes on to boast that the response to the seminar was so great that it had to be moved to a larger facility. Had Rumore been chilled[5] by Belk's letter, he certainly would not have invited Belk to speak at the seminar. To the contrary, Rumore went to great lengths to prove to Belk that his resolve regarding the seminar was stronger than ever. Factually, Rumore can-

**5.** In his reply to Belk's first letter, Rumore states as follows:
> You too should encourage, rather than attempt to chill, the exercise of free speech rights by our members and officers.

Although Rumore uses the "buzz" words of chilling free speech, the court cannot agree that Belk's first letter did this. Rumore's use of the words cannot provide support for his claim that Belk's letter chilled his speech. The court also points out that Rumore never says that he has been chilled, only that Belk should stop attempting to chill free speech.

not sustain a claim of chilled free speech when he so clearly demonstrates the opposite.[6]

Because the court concludes that Belk did not threaten Rumore or attempt to suppress his free speech, the court does not reach the issue of whether the letters were part of a plan to suppress speech within the Teamsters.[7] If the predicate act complained of does not suppress speech, it cannot be part of an overall plan to suppress speech. The court finds that this case is a political dispute in which a party wrongly interpreted an action to be a threat. The LMRDA was not promulgated to give subordinate labor entities an additional weapon to use against the dominant organization for political gain. This dispute between Belk and Rumore has not risen to a level that would give this court jurisdiction under the LMRDA; as a result, the court shall grant defendant Belk's motion for summary judgment.

## C. Plaintiff's Request for Additional Discovery

Plaintiff argues in his opposition to defendant's motion for summary judgment that he is entitled to further discovery before the court rules on this motion. Although it may be somewhat unusual for the court to grant summary judgment before any discovery takes place, the uncontroverted evidence of the content of Belk's letters satisfies the court that no amount of discovery could show that these letters constitute a sufficient threat of retaliation so as to impinge upon plaintiff's free speech rights. Federal Rule of Civil Procedure 56(f) allows this court to

delay ruling on defendant's motion for summary judgment pending further discovery in the event that the court finds that such discovery is necessary to allow the non-moving party to discover facts essential to defend the motion. See Strang v. United States Arms Control Disarmament Agency, 864 F.2d 859, 861 (D.C.Cir.1989). Plaintiff brought this complaint alleging that "[t]his suit arises from the defendant's threats of retaliation against Rumore for his public dissemination of views and opinions and his efforts to educate fellow teamster members as to their legal rights and obligations...." Complaint at ¶ 1. The court determined that the letters sent to plaintiff did not threaten retaliation; discovery cannot alter this conclusion.

Plaintiff argues that with discovery, he may be able to uncover the following information: (1) whether Carey or other members of the IBT helped Belk draft the two letters; (2) whether Belk had conversations with other IBT officials concerning the seminar; and (3) what conversations, if any, unnamed local union business agents, officer, trustees, and assistant trustees had concerning the seminar. All of this information is irrelevant in light of the court's conclusion that the letters themselves are innocuous. Even if Ron Carey himself helped Belk draft the letters, this court would still have no jurisdiction under the LMRDA because the letters do not threaten retaliation.

Plaintiff's final justification for discovery centers around his allegation that Belk acted with Carey-appointed trustees of some local unions to "intimidate and deter" attendance

---

**6.** Rumore argues that Belk's letters caused him to forgo speaking against trusteeships at the seminar because he feared retaliation. This position contradicts his reply letter. Also, even if Rumore did fear reprisal, he still cannot maintain an action under the LMRDA because that fear was unjustified and unreasonable in light of Belk's letters. As the Second Circuit noted, the LMRDA free speech provision is not implicated every time that a dissident perceives that the majority has issued a threat. Newman, 570 F.2d at 445. The court in Guzman implicitly recognized this idea when it decided that the plaintiff may have held a reasonable belief that the letter sent by the union actually threatened union discipline. The court relied on the unequivocal threat of legal action in the letter coupled with the plaintiff's lack of legal training to find that plain-

tiff may have held a reasonable belief that the union had threatened him with discipline. Guzman, 1995 WL 110584 at *4. In this case, however, Rumore's claimed reaction was unreasonable based upon language Belk used. The court is not constrained to deny defendant's summary judgment motion simply because Rumore claims, despite his reply letter, the he was "chilled" in his speech at the seminar.

**7.** Plaintiff devotes considerable time to outlining the dispute between Joint Council 16 and the IBT. Although the court must view Belk's letters in this context, once the court determines that the letters do not contain threats, all the information regarding this dispute becomes irrelevant to Rumore's claim.

at the seminar. In his affidavit, Rumore claims that during and after the seminar, he learned from an unnamed trustee of a local within Joint Council 16 and two business agents of local unions under trusteeships, that Carey and the International sent a message that no Joint Council 16 delegates or business agents in locals currently under trusteeship shall attend the seminar. Rumore Decl. at ¶ 42. However, this allegation, even if true, does not support any claim under the plaintiff's complaint. Plaintiff does not allege that Belk had any involvement with this alleged conduct, and Belk is the only defendant in this action. This alone allows the court to deny plaintiff's request for further discovery.

Moreover, although the plaintiff includes broad language in his complaint that he is suing on behalf of other, unnamed union members, Rumore is the only plaintiff; once the court has denied plaintiff's claim that Belk's letters were part of an overall plan to suppress dissent, any further evidence of the alleged plan becomes irrelevant. Also, Rumore cannot raise the claim that Belk's letters chilled speech on behalf of other unions members when the court has already found that Rumore himself was not, as a matter of fact, chilled. Rumore appears to be attempting to use these letters as a spring board to get extensive discovery into matters that are not relevant to his cause of action. If the court were to allow Rumore to conduct this discovery, it would distort the LMRDA and permit him to conduct a "fishing expedition" into the IBT in the hope of discovering damaging evidence without a valid underlying claim. *See Committee for the First Amendment v. Campbell,* 962 F.2d 1517, 1523 (10th Cir.1992).

## IV.

## CONCLUSION

For the forgoing reasons, the court shall grant defendant's motion for summary judgment and dismiss this action in an order issued this date.