**LOCAL 1150 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Jeffrey Cederbaum**

v.

**John SANTAMARIA, et al.**

**No. 3:00CV2041 (JBA).**

United States District Court, D. Connecticut.

Sept. 4, 2001.

70

Leon M. Rosenblatt, Lynn M. Mahoney, West Hartford, CT, for Plaintiff.

Jonathan L. Gould, James M. Sconzo, Michelle L. Treadwell, Halloran & Sage, Hartford, CT, Norman Zolot, Woodbridge, CT, for Defendant.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

Plaintiff Jeffrey Cederbaum was a member of the winning slate in an election for officers of plaintiff Local 1150 of the International Brotherhood of Teamsters held in November 1998. Following the election, defendants, leaders of the losing incumbent slate, the Local's election manager and the Local's attorney, allegedly engaged in a scheme to prevent plaintiff Cederbaum and his slate from gaining control of the Local and attempted to undermine their ability to perform their duties. This scheme included efforts to enlist the help of the International union in various electoral challenges, which ultimately resulted in a rerun election, and a plan to insulate three clerical workers from termination during plaintiff Cederbaum's term in office.

Notwithstanding Cederbaum's slate's victories in both the original and the rerun election and its termination of the losing incumbents' office manager, Local 1150 and Cederbaum filed suit alleging a breach of fiduciary duty under the Labor Management Reporting and Disclosure

Act ("LMRDA"), breach of common law fiduciary duty, and a violation of the LMRDA bill of rights against each of the defendants and asserting a legal malpractice claim against the Local's former attorney, defendant Robert Cheverie. All defendants have moved to dismiss. Following oral argument, the Court invited supplemental briefing on the legislative history of the breach of fiduciary duty provision of the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 501(a). For the reasons discussed below, the Court concludes that the Local has no standing to pursue a cause of action under the LMRDA, 29 U.S.C. § 501(a), and that plaintiff Cederbaum's allegations as a matter of law do not make out a violation of the Labor Management Reporting and Disclosure Act of 1959, § 101, 29 U.S.C. § 411.

## FACTUAL BACKGROUND

The following summary is taken from plaintiffs' Amended Complaint [Doc. # 19] and is assumed to be true for purposes of this motion to dismiss. *See Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir.2001). Plaintiff Local 1150 of the International Brotherhood of Teamsters ("IBT") represents employees of Sikorsky Aircraft in Connecticut, Alabama and Florida. Amended Compl. at ¶ 4. Defendant John SantaMaria was Secretary–Treasurer of IBT Local 1150 from 1996 until 1998. *Id.* at ¶ 18. Defendant Bruce Peters was President of Local 1150 and Business Agent from 1996 to 1998. *Id.* at ¶ 19. Defendant Joseph Bennetta is Secretary–Treasurer of IBT Local 191. *Id.* at ¶ 20. In 1998, Bennetta was appointed by Local 1150 to serve as Local 1150's Election Officer. *Id.* As Election Officer, he was responsible for running and supervising all aspects of the election, including chairing union meetings concerning nominations for office and election pro-

cedures, determining eligibility for office, supervising the preparing and counting of ballots, and handling pre-election complaints and objections from members and candidates. *Id.* Defendant Robert Cheverie was Local 1150's attorney until some point in 1998. *Id.* at ¶ 21.

In October 1998, plaintiff Cederbaum was nominated and ran with his slate for office in Local 1150 against the incumbents—defendants SantaMaria and Peters. *Id.* at ¶ 5. The election was held on November 6, and Cederbaum's slate, the "Reform Team" was elected. *Id.* at ¶¶ 5–6. "Both before the election and afterwards, the defendants engaged in a scheme to frustrate union democracy by preventing the Reform Team from taking operational control of Local 1150." *Id.* at ¶ 8. James P. Hoffa, president of the International Brotherhood of Teamsters ("IBT") and the IBT participated in the scheme. *Id.* Cederbaum had supported Thomas Leedham, Hoffa's rival for the IBT general presidency. *Id.* at ¶ 2. Defendant Benetta was Hoffa's campaign manager in Connecticut. *Id.* at ¶ 3.

During the Local 1150 campaign, one of the Reform Team's promises was to reorganize the clerical staff and replace employees who did not work for the benefit of the members, particularly the office manager. *Id.* at ¶ 7. Although Cederbaum was elected to office on November 6, 1998, defendants SantaMaria and Peters prevented him from being sworn into office until November 30, 1998, and prevented him from assuming his full duties until January 1, 1999, in violation of the IBT constitution. *Id.* at ¶¶ 9, 31. The Reform Team was only sworn in on November 30 after the Acting General President of the IBT intervened and ordered their installation. *Id.* at ¶ 31. Defendants sought to stay in office until Hoffa was installed as the IBT general president, because defen-

dants thought Hoffa would assist them in overturning the election. *Id.* Hoffa did not take office until May 1, 1999. *Id.* Defendants also sought "to ensure they were in a position to take vicarious control over the Local through an office staff loyal to them." *Id.*

Local 1150 employed three full-time clerical and administrative employees who were members of Local 1150 and paid dues to Local 1150. *Id.* at ¶ 22. These employees were regarded by defendants as loyal to the SantaMaria slate and as "willing agents to help undermine the Reform Team's efforts to institute internal union reforms." *Id.* at ¶ 23. In October 1998, prior to the first election in November 1998, defendants SantaMaria, Peters and Bennetta conspired to ensure that these clerical employees could not be replaced if the Reform Team won the election. *Id.* at 24. On plaintiff's information and belief, defendant Cheverie assisted the creation of this scheme. *Id.* "The defendants used their positions as agents, officers and representatives of Local 1150 to promote their own personal and political interests to frustrate the democratic process to the detriment of the members of Local 1150 and the plaintiffs." *Id.*

The scheme created by defendants required the clerical employees to withdraw from Local 1150 and become dues paying members of Bennetta's Local 191. *Id.* at ¶ 25. If the Reform Team won the election, Bennetta and SantaMaria and Peters on behalf of Local 1150 would execute a collective bargaining agreement with Local 191 providing that the clerical workers could not be replaced and their responsibilities could not be changed or reduced during the Reform Team's three year term. *Id.* If the SantaMaria slate won, the collective bargaining agreement for the clerical staff would not be implemented. *Id.* at 26. Defendants took steps to

implement the scheme, including drafting a collective bargaining agreement, but eventually changed it "because it became apparent that the National Labor Relations Board, the IBT, and/or the United States Department of Justice would not allow Local 191 to represent the clerical workers (who were still members of Local 1150) against the employer Local 1150. The revised scheme was to bring in the Office and Professional Employees International Union (OPEIU) to perform the same function as Local 191 was going to perform." *Id.* at 27–28. This new scheme was announced to the clerical staff shortly after the Reform Team won the election. *Id.* at ¶ 30.

After Cederbaum and Raymond McMorrin, the other Reform Team candidate, took office on November 30, 1998, they "were confined to a small, mostly-empty office while the defendants continued to carry out their scheme. The clerical staff was not allowed to talk with Cederbaum and McMorrin." *Id.* at ¶ 31. Defendants required the clerical staff to sign representation cards in favor of the OPEIU, and the OPEIU requested to be recognized as the collective bargaining representative of the clerical staff on November 25, 1998. *Id.* at ¶ 32. On December 4, 1998, the OPEIU filed a petition for election with the NLRB; on December 8, Attorney Cheverie signed a stipulated election agreement on behalf of Local 1150 stipulating to the bargaining unit and election rules, although there were legal grounds for contesting the bargaining unit and election. *Id.* at ¶¶ 33–34. Posters announcing this election were sent by the NLRB to Attorney Cheverie and/or SantaMaria and Peters on December 9, 1998, and were posted in areas of the union hall which were not accessible to Cederbaum and McMorrin, who did not see the posters. *Id.* at ¶ 35. The election was held December 18, and the clerical staff voted 3–0 to have the

OPEIU represent them against Local 1150. *Id.* at 36. Defendants SantaMaria and Peters "attended the election and applauded the results. Meanwhile, Cederbaum and McMorrin were confined to their office in another part of the building and were not apprised of what was going on and did not know an election was being held." *Id.* at ¶ 37. The election results were certified by the NLRB on December 29, 1998. *Id.* at ¶ 39.

On December 24, 1998, SantaMaria and Peters signed a contract with the OPEIU making the clerical employees permanent employees, prohibiting changing the established job classifications even if there were a change in the administration of Local 1150, and requiring wage increases and cost of living adjustments to be given commensurately with the increases received by employees of Sikorsky Aircraft regardless of Local 1150's financial condition. *Id.* at ¶ 38. This agreement was to be in effect until May 14, 2002, six months after the next Local 1150 election. *Id.* The contract. with OPEIU was not approved by the Executive Board of Local 1150 or the personal representative of the IBT Acting President. *Id.* at ¶ 40.

The OPEIU contract "was left on Santa-Maria's desk for Cederbaum to discover after December 31, 1999, when Cederbaum moved into SantaMaria's office. On January 8, 1999, Local 1150 repudiated the contract with the OPEIU." *Id.* at ¶ 41. The office manager was terminated on or about March 12, 1999, and went to work for Local 191. *Id.* at ¶ 42. On March 18, 1999, the office manager filed an NLRB charge against Local 1150 in the name of the OPEIU; this charge was prepared by or with participation of defendant Cheverie. *Id.* at ¶ 43. The NLRB investigated the complaint from March 19 until June 28, 1999, with defendant Cheverie participating in the investigation on behalf of the

office manager and/or the OPEIU against Local 1150. *Id.* at ¶ 44. On June 28, 1999, Attorney Cheverie signed and filed an amended unfair labor practice charge on behalf of the office manager and OPEIU. *Id.* at ¶ 45. "The OPEIU and Local 191 were parties adverse to the interests of Local 1150 and its members. Nevertheless, the defendants promoted the interests of the OPEIU and Local 191 to the detriment of Local 1150 for the ultimate purpose of promoting their own personal interests." *Id.* at ¶ 46.

As a result of defendants' actions, plaintiffs "were forced to divert a great deal of time and resources away from reforming the operations of Local 1150 and performing their collective bargaining responsibilities on behalf of Local 1150's members. In addition, Local 1150 incurred significant expenses and counsel fees defending and resolving the NLRB charges." *Id.* at ¶ 47.

On April 30, 1999, defendants SantaMaria, Peters and Bennetta met with Hoffa in a bar in Washington, DC and planned to return control of Local 1150 to SantaMaria and Peters. *Id.* at ¶ 10. On that same day, Hoffa and the IBT overturned the November 6, 1998 election and ordered a new election. "The reasons given for overturning the election were contrived, arbitrary and illogical, and contrary to democratic processes guaranteed by the LMRDA." *Id.* One reason given was the imposition of more stringent electoral procedures on challengers than on incumbents. In July 1999, Cederbaum's slate, the Reform Team, won the re-run election.

## DISCUSSION

Plaintiffs' Amended Complaint alleges that defendants violated the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 501, by "violating their positions of trust for their own personal and political interests; in relation to Local 1150 and its members; failing to hold Local 1150's

money and property solely for the benefit of Local 1150 and its members; failing to expend Local 1150's money and property in accordance with the IBT constitution and bylaws and resolutions of the governing bodies; and dealing with Local 1150 as an adverse party on behalf of an adverse party" (Count One). Plaintiff Local 1150 also claims that all defendants breached state common law fiduciary duties owed to Local 1150 and its members (Count Two) and that Attorney Cheverie committed legal malpractice by breaching the fiduciary duties owed to Local 1150 and breaching the standard of care owed by an attorney to his clients (Count Three). Finally, plaintiff Cederbaum alleges that "[d]efendants SantaMaria, Peters and Bennetta have engaged in a purposeful scheme to subvert the democratic processes guaranteed by the LMRDA," in violation of 29 U.S.C. §§ 411 and 412 (Count Four).

All defendants have moved to dismiss [Docs. ## 20, 22, 24]. Defendant Cheverie argues that the Court lacks jurisdiction over Local 1150's 29 U.S.C. § 501 breach of fiduciary duty claim and that even if the Court had jurisdiction over that claim, plaintiffs failed to obtain leave of Court before bringing the action, and that Local 1150 has failed to state a claim upon which

relief can be granted against him. Defendant Bennetta also argues that the Court lacks jurisdiction over the § 501 claim and that plaintiffs have failed to state a cause of action under § 501 or §§ 411 and 412 against Bennetta. Defendants SantaMaria and Peters do not challenge the Court's jurisdiction over Local 1150's § 501 claim, but instead argue that facts alleged in the amended complaint do not state a claim for breach of fiduciary duty under the LMRDA and that plaintiff Cederbaum's §§ 411 and 412 claim must fail because he does not allege that SantaMaria or Peters disciplined him or chilled his rights as a union member to speak freely, vote, sue or attend union meetings. All defendants urge the Court to decline to exercise supplemental jurisdiction over the state law claim for breach of fiduciary duties and further argue that Connecticut law has never recognized a cause of action against union officers for a breach of alleged fiduciary duties.

## A. *Local 1150's § 501 claim*

■ Section § 501 of the LMRDA provides that a member of a labor organization may sue to enforce the fiduciary duty imposed on union officers.[1] As the Supreme Court observed, however,

---

1. 29 U.S.C. § 501, provides as follows:

    **(a) Duties of officers; exculpatory provisions and resolutions void**

    The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an

    adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.... 

    **(b) Violation of duties; action by member after refusal or failure by labor organization to commence proceedings; jurisdiction; leave of court; counsel fees and expenses**

    When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the

Section 501(b), 29 U.S.C. § 501(b), by its terms, does not establish a private right of action for a union itself. Rather, it provides that a suit may be brought in district court by a union *member* when a union officer is alleged to have breached his duties "and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization."

*Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493 U.S. 365, 374 n. 16, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990) (*quoting* 29 U.S.C. § 501(b)) (emphasis in original). The circuits are split on this issue, and the Second Circuit has not ruled on the question. *See id.* (noting circuit split but assuming without deciding that a union may sue under § 501).

Plaintiff Local 1150 argues that the Court should follow the Eleventh Circuit's decision in *International Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. Statham,* 97 F.3d 1416, 1419 (11th Cir.1996), which found an implied cause of action for a union under § 501(a). According to plaintiff, the "complete absence of comment in Congress on [this] point strongly suggests that it was simply taken for granted that 501(a) provided a cause of action for unions." Pl.Supp.Br. at 11. In addition, plaintiff's counsel at oral argument pointed out the seeming futility of

prohibiting the union from bringing suit in federal court, because in cases such as this one, where the Local wishes to bring such a suit, a member cannot in good faith meet the prerequisite requirements of § 501(b) that the union refuse or fail to sue after request.

Defendants, in contrast, urge the Court to follow *Local 443, Int'l Bhd. of Teamsters v. Pisano,* 753 F.Supp. 434, 436 (D.Conn.1991), in which Judge Eginton held that the scope of federal jurisdiction under 501(b) should be narrowly construed in light of "the federal policy of noninterference in the internal affairs of unions and labor matters" and declined to find an implied cause of action because the plain language of § 501 does not permit a union to sue its officials in federal court.[2] Defendants also cite to a Ninth Circuit decision, *Building Material & Dump Truck Drivers, Local 420 v. Traweek,* 867 F.2d 500, 506 (9th Cir.1989), which similarly relied on the fact that Congress chose to permit suits by union members under § 501 only if the union itself refuses or fails to sue as proof that "Congress intended that this remedy be available solely to individual union members."

■ Where, as here, a party seeks to pursue an implied cause of action from a federal statute, the proper mode of analysis begins with the Supreme Court's test from *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[3]

labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organiza-

tion. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. . . .

2. *See also Local 191, Int'l Bhd. of Teamsters v. Rossetti,* 135 L.R.R.M. (BNA) 2631, 1990 WL 128241 (D.Conn. Aug.23, 1990) (same).

3. Although neither plaintiff nor defendants address the *Cort v. Ash,* factors, this is understandable, as many of the decisions on this

In *Cort,* the Supreme Court held that the following factors are to be used to determine whether a cause of action should be implied under a federal statute:

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff one of the class for whose especial benefit the statute was enacted,—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* (citations and internal quotations omitted).

■ "Recent Supreme Court decisions have refocused the *Cort* analysis to 'emphasize the centrality of the second factor—congressional intent,' treating the other factors as 'proxies for legislative intent.'" *McClellan v. Cablevision of Conn.,* 149 F.3d 161, 164 (2d Cir.1998) (*quoting DiLaura v. Power Auth. of N.Y.,* 982 F.2d 73, 77–78 (2d Cir.1992) (*quoting Health Care Plan, Inc. v. Aetna Life Ins. Co.,* 966 F.2d 738, 740 (2d Cir.1992) and *citing Karahalios v. National Fed'n of Fed. Employees, Local 1263,* 489 U.S. 527, 532–33, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989);

*Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979))). Thus, unless such intent can be inferred from the language of the statute, the statutory structure, or some other source, there is no basis for the implication of a private remedy. *See Thompson,* 484 U.S. at 179, 108 S.Ct. 513; *Reeves v. Continental Equities Corp.,* 912 F.2d 37, 40 (2d Cir.1990).

Applying the *Cort* factors here and considering the language and structure of the statute, based on the Court's review of the extensive legislative history of the LMRDA and the supplemental briefing submitted by the parties, the Court concludes that the statutory language and the legislative history of the LMRDA provide no basis for the implication of a cause of action for Local 1150 under § 501(a) of the LMRDA.

The most attractive argument in favor of finding an implied cause of action, relied upon by the Eleventh Circuit in *Statham* and by plaintiffs here, is the reasoning that despite the absence of an express cause of action for unions, the statute clearly contemplates some forum in which the unions could bring suit, because it expressly conditions a member's right to sue upon the union's failure to do so. *See Statham,* 97 F.3d at 1419 ("Subsection 501(b) does not itself confer jurisdiction over suits by the union, but it assumes that a union can sue its officials; otherwise it would be futile for individuals to request the union to sue

issue do not do so either. *See, e.g., Traweek,* 867 F.2d at 506–07 (analyzing whether Local had standing under § 501(b)); *Pisano,* 753 F.Supp. at 436 (same); *Statham,* 97 F.3d 1416 (concluding that it would frustrate Congressional intent to deny cause of action for union but not addressing *Cort v. Ash* factors). *But see United Transp. Union v. Bottalico,* 120

F.Supp.2d 407, 408–10 (S.D.N.Y.2000) (applying *Cort v. Ash* factors and concluding that there was no evidence of Congressional intent to provide a cause of action for unions); *International Longshoremen's Ass'n v. Spear,* No. Civ. A. 97–2438, 1998 WL 83684 (E.D.Pa. Feb.25, 1998) (same).

and senseless to make the individuals engage in a futile act."); *Brotherhood of Ry., Airline & Steamship Clerks v. Orr*, 95 L.R.R.M. (BNA) 2701 (E.D.Tenn. May 18, 1977) ("While there is no express grant of jurisdiction over a labor organization against its officers, the Court is of the opinion that a grant of such jurisdiction is implied in that it would seem pointless to require as a prerequisite to his bringing suit that an individual member first request the labor organization to sue and then not provide jurisdiction over a suit by the organization so it might comply with the request."). Were there no indication in the legislative history that Congress contemplated a non-federal forum for suits by unions, this futility argument would have logical appeal.

However, the legislative history demonstrates that Congress believed that state common law remedies were available for breach of fiduciary duty, even if not ideal.[4] For example, the House Report on the bill later enacted as the LMRDA contains the following statement by Representative Eliot (the member who introduced the bill) and four other House members about § 501:

*Although the common law covers the matter*, we considered it important to write the fiduciary principle into federal labor legislation.... The bill also authorizes a union member to bring an action against any official or agent who violates his fiduciary obligations, if the union refuses to sue—and again such member may recover counsel fees and costs if he prevails.

H.R.Rep. 86–741 (emphasis added); *see also* 105 Cong.Rec. 5856 (1959) (statement of Sen. Kennedy), *reprinted in* 2 NLRB, *The Legislative History of the Labor–Management Reporting and Disclosure Act of 1959*, at 1130 (1959) (hereinafter "2 NLRB, *Legislative History*") (Traditionally, questions of fiduciary relationships have been decided in state courts under the common law. Now it is proposed to provide a Federal remedy and a Federal rule.... [A]nyone who studies State statutes, or the decisions of State courts, will realize that there is a well developed body of law in the states defining the term "fiduciary." ... Now, in addition to the State remedy, it is proposed to add a Federal remedy, without any previous decisions in this area, and without any statute.).[5] Thus, as the Court finds that Con-

---

4. Defendants' arguments that the Local has neither a cause of action under § 501 nor a state common law remedy for breach of fiduciary duty may be inconsistent, as the text of § 501(b) clearly contemplates *some* legal vehicle for suits by unions alleging breaches of fiduciary duty.

5. Contemporary commentators also noted that union officials were considered fiduciaries at common law, although the scope of the obligation was unclear. *See, e.g.*, Archibald Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 Mich.L.J. 819, 827 (1960) ("Despite the scarcity of direct precedent, it seems plain that all union officers and employees have always been subject to the usual common-law fiduciary duties of an agent. Violations are redressible in state courts."); Frank J. Dugan, *Fiduciary*

*Obligations Under the New Act*, 48 Geo.L.J. 277, 279 (1960) (noting that "[c]ontrary to the assertion by Senator Erwin made on the floor of the Senate a year ago that there was no need for a federal fiduciary law because of the adequacy of existing state law, an examination of the cases reveals" a surprising lack of case law on the application of the fiduciary obligation to unions, but observing that although the "courts have often taken stringent action under the fiduciary concept ... [p]erhaps union members have been reluctant to pursue their legal remedies in this are for fear of jeopardizing their relationship with their union, with the consequent threat of loss of job opportunities"); R. Theodore Clark, *The Fiduciary Duty of Union Officials Under Section 501 of the LMRDA*, 52 Minn.L.Rev. 437, 454 (1968) ("It is clear that union officials were considered fiduciaries at common law.

gress contemplated that the unions could bring suit in state court, the demand requirement of § 501(b) is not rendered "futile" by the denial of a right of action to Local 1150 in federal court. *See Bottalico,* 120 F.Supp.2d at 409.

The Court further concludes that the four *Cort* factors similarly provide no basis for creating an implied cause of action for the Local. First, there is no evidence that unions are part of the "especial class" for whom § 501 was enacted. The legislative history of the LMRDA reveals no concern for "unions themselves having access to federal court" but rather shows that the LMRDA was "in large measure an entitlement statute for union members, creating democratic rights within the union, and providing access to federal court to vindicate those rights *as against their union leadership.*" *Spear,* 1998 WL 83684, at *5 (emphasis in original); *see also Phillips v. Osborne,* 403 F.2d 826, 829 (9th Cir.1968) ("The congressional history of the Landrum–Griffin Act makes it abundantly clear that Congress ... intended to deal solely with the activities of union leaders as they

affected their members."); *Mallick v. International Bhd. of Elec. Workers,* 749 F.2d 771, 776 (D.C.Cir.1984) ("By ensuring that members could assert practical control over union policies, Congress attempted to prevent corruption with a minimum of direct federal intervention in union decisionmaking.").[6] Thus, the first *Cort* factor weighs against the creation of an implied cause of action.

The second question, whether there is evidence of any legislative intent to provide a remedy to unions, must also be answered in the negative. As discussed above, because Congress contemplated the availability of state common law remedies, the conditioning of members' rights to sue under § 501(b) does not, in the Court's view, suggest any Congressional preference for federal suits by unions.

The Eleventh Circuit, in reaching the opposite conclusion, found that "it would in fact frustrate congressional intent to relegate the union to state remedies. The legislative history of the LMRDA shows that Congress enacted the fiduciary provisions of section 501 because existing state

---

Nevertheless, the state courts have been vague in delineating the exact nature of the fiduciary duties which a union official owes to his union.").

**6.** *See, e.g.,* 105 Cong.Rec. 5446 (1959) (statement of Sen. Goldwater), *reprinted in* 2 NLRB, *Legislative History* 1026 (proposed amendments to Kennedy bill would "[i]mpose fiduciary obligations, enforceable by members, on the officials of labor unions"); 105 Cong.Rec. 5490 (1959) (statement of Sen. Goldwater), *reprinted in* 2 NLRB, *Legislative History* 1034 ("a study of federal law and the investigation of the Senate Rackets Committee make it crystal clear that the rank and file of union members have no protection of any kind against dictatorial and corrupt officers of unions or against the connivance of management with a corrupt labor leader to deprive them of their rights"); 105 Cong.Rec. 5627 (1959) (statement of Sen. Ervin) *reprinted in* 2 NLRB, *Legislative History* 1046 ("there is a

crying need for immediate remedial legislation in the field of the relation between unions and union officers, on the one hand, and rank-and-file union members, on the other"); 105 Cong.Rec. 5857 (1959) (statement of Sen. McClellan), *reprinted in* 2 NLRB, *Legislative History* 1131 ("I may say that there was never any idea of my trying to curb the authority of the members of a union to do whatever the members want to do; it is my intention to protect the members from having the members of a board or a committee vote to do just about anything they want to do, as has been the case in many instances."); 105 Cong.Rec. 5862 (1959) (statement of Sen. Curtis), *reprinted in* 2 NLRB, *Legislative History* 1136 ("if the real power in a union is vested in the rank and file of its members, that accomplishment alone will eliminate a great portion of all the abuses and misuse of funds and misuse of power and the other offenses which all of us must frown on").

law remedies for union officials' misconduct were inadequate." *Statham,* 97 F.3d at 1420. The legislative history cited by the Eleventh Circuit in support of this proposition, however, evidences only concern about the absence of adequate state law remedies for union *members* and does not support that court's conclusion that "Congress intended to supplement the remedies available to *unions* by creating new federal protections." *See id.* (*citing* S.Rep. No. 187, 86th Cong., 1st Sess. *reprinted in* 1959 U.S.C.C.A.N. 2318, 2376; H.R.Rep. No. 741, 86th Cong., 1st Sess.

*reprinted in* 1959 U.S.C.C.A.N. 2424, 2479–80).

Moreover, contrary to the Eleventh Circuit's assumption that "[i]f Congress had only enacted section 501(a) without section 501(b), no one would suggest that Congress meant to deny the union the right to enforce 501(a)," *id.,* the legislative history suggests that § 501(b) was added precisely because, in the absence of such a remedy provision, Congress feared that the fiduciary duty established by § 501(a) would be an empty declaration.[7]

---

7. S.505, (the original Kennedy–Ervin Bill) introduced in the Senate in January 1959, did not contain any express provision establishing a fiduciary duty owed by union officers. S.748 (the Republican administration bill) would have given a cause of action to union members or officers to enforce the fiduciary duties of officers. 105 Cong.Rec. 1162 (1959), *reprinted in* 2 NLRB, *Legislative History* 978. S.505, in contrast, provided only that members could sue, with leave of court and if the union failed to sue, to recover embezzled or misappropriated funds. 105 Cong.Rec. 1167 (1959), *reprinted in* 2 NLRB, *Legislative History* 983. The Kennedy–Ervin bill, later amended as S.1555, also contained a provision declaring that labor organizations should voluntarily adopt "codes of ethical practices obligating such labor organizations ... to adhere to principles and procedures of conduct which will effectively eliminate and prevent improper and unethical activities in the administration of their affairs, in the use and expenditure of their funds and in their relations with each other." Senate Comm. on Labor and Public Welfare, *Labor–Management Reporting and Disclosure Act of 1959,* S.Rep. 86–187, 86th Cong., 1st Sess.1959, *reprinted in* 1959 U.S.C.C.A.N. 2318. S.1555 was favorably reported out of committee on April 14, 1959.

The omission of a comprehensive remedy provision from S.1555 prompted the following minority objection in the Senate report by Senators Goldwater and Dirksen:

The committee bill professes to recognize the fiduciary nature of the union official's relation to his union and its members, but makes no provision to establish such relationship, to impose the duties of a fiduciary on union officials, or to give union members any remedy for a breach of fiduciary obligation.

\*\*\*

Both the McClellan Bill (S.1137) and S.748 contain provisions designed to impose fiduciary obligations on union officials and to give union members a right to sue in the federal courts for breach thereof. It is our intention to offer on the floor of the Senate amendments to fill this unjustifiable vacuum.

*Id.*

After S.1555 was reported out of committee, there was further discussion on the Senate floor about the lack of a remedy under S.1555:

Mr. Javits: Even if we adopt the amendment which has been proposed, to which I have no objection, would it not be better to try, even after that, to find some formula, which I am endeavoring to work out, with which to deal with the whole fiduciary relationship, especially in terms of a remedy?

Once fiduciary relationship is stated it will soak up all the common law, all the State law, and all the Federal law. Really, what we need in the bill to give it teeth, as we did in the New York bill, which is a good model, is some remedy....

Mr. McClellan: ... Frankly, I think the union member should be given a right to sue for recovery. I have another amendment along that line.

\*\*\*

Mr. Javits: But I am satisfied that to create a Federal statute, such as the Senator desires, with respect to money relationship, will still leave the question of the remedy open. The question is, Do we want to leave

Finally, the Eleventh Circuit concluded that "section 501(b) clearly shows that it has not one, but two purposes: first, to enable individuals to sue on the union's behalf, and second, to make sure that individuals do not preempt a union's right to prosecute its own claims." *Statham*, 97 F.3d at 1421. However, in this Court's opinion, § 501(b)'s imposition of the requirement that members obtain leave to sue does not express a preference for suits by unions, but rather suggests "congressional intent to limit frivolous or harassing litigation by union members." *International Longshoremen's Ass'n v. Spear*, No. CIV. A. 97–2438, 1998 WL 83684, *6 (E.D.Pa. Feb.25, 1998). Indeed, it appears more likely based on the legislative history that Congress anticipated that unions often would be able to resolve problems internally or through state common law remedies, but, based on Congressional findings of widespread corruption in union leadership, granted members a federal remedy in those situations where the union failed to act to protect its interests and the interests of its members.[8]

■ In addition, the fact that Congress here expressly gave a remedy to union members to enforce § 501(a) weighs heavily against finding legislative intent to give a cause of action to the Local. *See Bottalico*, 120 F.Supp.2d at 409. "As an elemental canon of statutory construction, we are to be especially reluctant to imply a private right of action where the statute explicitly provides a different remedy. In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Salahuddin v. Alaji*, 232 F.3d 305, 309 (2d Cir.2000) (internal quotation marks omitted, citing *Karahalios v. National Fed'n of Federal Employees, Local 1263*, 489 U.S.

the question of the remedy open to any suit aside from a federal court suit which might lie by reason of diversity of citizenship or any other ground outside the statute? Or do we want to have a section of the bill which concerns itself with the right to sue, and to provide in that section a right to the individual member to sue when the union itself does not act, given a decent period of time?

105 Cong.Rec. 5855, 5858 (1959), *reprinted in* 2 NLRB, *Legislative History* 1129, 1132.

S.1555 as passed by the Senate on April 29, 1959 provided for suits by members only where an officer had embezzled or misappropriated funds. Senator Goldwater identified the lack of a general remedy provision for breach of fiduciary duty as one of the "major deficiencies" in the Senate bill. *See* 105 Cong.Rec. 6849 (1959) (statement of Sen. Goldwater), *reprinted in* 2 NLRB, *Legislative History* 1272. In a speech to the House Committee on Labor and Education, he again emphasized the lack of an adequate remedy for members for breach of fiduciary duty. *See* 105 Cong.Rec. 9116–17 (1959) (statement of Sen. Goldwater), *reprinted in* 2 NLRB, *Legislative History* 1288–89 ("The whole vast area of fiduciary law which not only requires fidu-

ciaries to refrain from criminal conduct in the handling of other peoples' funds or property ... but affirmatively requires them to act with the highest possible degree of care ... is provided with no enforcement machinery, remedy, sanction, or penalty under the Senate bill.").

In the House bill that eventually became the LMRDA as enacted, however, the remedy provision was amended to permit suit by union member for violation of any of the fiduciary duties identified in § 501(a). *See* House Comm. on Educ. and Labor, *Labor–Management Reporting and Disclosure Act of 1959*, H.R.Rep. 86–741, 86th Cong., 1st Sess.1959, *reprinted in* 1959 U.S.C.C.A.N. 2318 (substituting text of H.R.8400 in S.1555, and containing present version of § 501).

8. *See supra* note 6; *see also* Note, *The Fiduciary Duty Under Section 501 of the LMRDA*, 75 Colum.L.Rev. 1189, 1195 (1975) ("the procedures outlined in section 501(b), demand and refusal, showing of good cause and leave of court ... were designed to protect the union from unnecessary disruption in cases where it would have been able to rectify the matter internally").

at 533, 109 S.Ct. 1282; *Middlesex Cty. Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 15, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)).

Local 1150 also argues that this case does not pose a threat of federal judicial interference with union autonomy because here the union itself requests federal court involvement, and therefore the concerns motivating the narrow construction of federal causes of action do not apply. However, at least one court has noted that

> a jurisdictional grant to a union plaintiff would fail to balance the competing legislative interests in enhancing union democracy on the one hand, and noninterference with internal union affairs on the other. Such a jurisdictional grant would at least present the potential for harassing litigation by a union against a dissident officer, or by an international union against a dissident local, in direct conflict with the legislative scheme.

*Spear,* 1998 WL 83684, at \*8. This Court agrees.

■ As for the final two *Cort* factors, where, as here, the first two *Cort* factors do not suggest legislative intent to create a federal cause of action, the final two factors need not be addressed as they alone cannot constitute sufficient evidence of Congressional intent. *See Health Care Plan, Inc. v. Aetna Life Ins. Co.,* 966 F.2d 738, 742 (2d Cir.1992).

To summarize, the Court finds that the statutory language and the legislative history provide no evidence of any Congressional intent to permit a cause of action on behalf of a union for breach of fiduciary duty by officers. Judge Brody's conclusion in *Spear* is equally applicable here:

> [The union] argues that it makes no sense to deny a federal forum to a labor organization to recover for breaches of fiduciary duty by its officers, agents, shop stewards or other representatives when such duties are created by federal law. I am not convinced that it makes no sense, as the provision of a remedy for unions was simply not the focus of the legislation.... Moreover, the union has adequate remedies under state law (notably the supplemental state claims brought in this action, for fraud, breach of contract, breach of fiduciary duty, and unjust enrichment). If the union did not pursue the state claims, a member of [the union] could bring an action under § 501(b) to recover damages caused by defendants' alleged breach of fiduciary duty. In any event, it is for Congress to create federal jurisdiction where none exists.

1998 WL 83684, at \*8.[9]

**B. *Cederbaum's §§ 411 and 412 claims***

■ Defendants also argue that Cederbaum fails to state a claim upon which relief can be granted because the acts alleged in the complaint do not amount to a violation of his rights under LMRDA, § 102, 29 U.S.C. §§ 411, 412 (hereinafter "LMRDA, § 102").[10]

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
>
> **(2) Freedom of speech and assembly**

**9.** Because the Court finds that the Local has no cause of action under § 501, the Court does not reach defendants' alternative arguments as to whether Local 1150's claims are within the scope of § 501 of the LMRDA, or whether defendant Cheverie is properly considered an "agent" of Local 1150 for purposes of that statute.

**10.** 29 U.S.C. § 411 provides as follows:

(a)(1) **Equal rights**

Plaintiff Cederbaum's § 102 claim is not based on allegations of retaliation or improper discipline. Instead, he contends that defendants' attempts to prevent Cederbaum and his slate from taking office after the election, including their actions leading to the re-run election, and their efforts to continue OPEIU representation of Local 1150's clerical workers was part of "a scheme to frustrate union democracy." Pl.Br. at 12. Plaintiff argues that these facts state an LMRDA cause of action because his rights "secured by the provisions of the LMRDA" were infringed by defendants' acts and that such interference is sufficient to state a claim under the LMRDA, *citing Franza v. International Bhd. of Teamsters Local 671*, 869 F.2d 41, 48 (2d Cir.1989) and *Finnegan v. Leu*, 456

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual *obligations.*

### (3) Dues, initiation fees, and assessments

Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except [under certain circumstances not applicable here]. . . .

### (4) Protection of the right to sue

No labor organization shall limit the right of any member thereof to institute an action in any court, . . .

U.S. 431, 432, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982). Pl.Br. at 15.[11] At oral argument, plaintiff clarified that he claims that his LMRDA rights as both a union officer and as a member were violated.

■ Ordinarily, status as a union employee or appointed officer is not a membership right within a union and is not protected by Title I of the LMRDA, § 101, 29 U.S.C. § 411. *See Finnegan*, 456 U.S. at 438, 102 S.Ct. 1867; *Maddalone v. Local 17, United Bhd. of Carpenters*, 152 F.3d 178, 184 (2d Cir.1998). Thus, "courts considering Title I claims have required that the challenged action directly affect or alter the union member's rights *qua* member." *Franza*, 869 F.2d at 47.

### (5) Safeguards against improper disciplinary action

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

### (b) Invalidity of constitution and bylaws

Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.

29 U.S.C. § 412 provides as follows:

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located.

11. Plaintiff correctly notes that a suit may be brought to redress an infringement of § 411 rights even where no improper "discipline" is shown. *See Finnegan*, 456 U.S. at 439, 102 S.Ct. 1867.

■ However, the Second Circuit has "recognized an exception where the removal of a union officer was part of [a] 'purposeful and deliberate attempt ... to suppress dissent within the union.'" *Maddalone*, 152 F.3d at 184 (*quoting Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir.1973); *Cotter*, 753 F.2d at 229 (2d Cir. 1985)). This exception recognizes that "the rights of union members to belong to an open democratic labor organization are infringed" when a "dominant group strives to stifle dissent and efforts at reform" through removal of a political opponent from office. *Id.* (*quoting Adams–Lundy v. Association of Prof. Flight Attendants*, 731 F.2d 1154, 1158 (5th Cir.1984)). Because a union officer may become a symbol for a movement within the union membership, the discipline of such an official could chill the *membership's* Title I rights. *Franza*, 869 F.2d at 45. "In such cases— rare though they may be—the question is whether an action against the official is merely an isolated act of retaliation for political disloyalty" or part of a scheme to curtail dissent. *Id.* To fall within this exception, a plaintiff must present "clear and convincing proof" that his dismissal as an officer was "part of a series of oppressive acts by the union leadership that directly threaten the freedom of members to speak out." *Cotter*, 753 F.2d at 229; *accord Franza*, 869 F.2d at 45; *see also Schonfeld*, 477 F.2d at 904 (holding that to state a cause of action, the alleged scheme to suppress dissent must be evident either in the established history or articulated policy of the union).

■ Unlike the more usual case where a losing dissident member may be deprived of membership rights following the election of an opposing party's candidate, here plaintiff Cederbaum's slate *won* the election and thus held the power to thwart or undo post-election recriminatory conduct

by the defendants. Plaintiff has identified no membership rights that were violated by defendants' actions. At oral argument, plaintiff acknowledged that defendants did not interfere with the election process itself, and that he was not prevented in any way from participating in the election or the re-run election. Although Cederbaum alleges that his ability to serve as an effective officer was impeded by his location in an inferior office and defendants' efforts to insulate disloyal clerical staff from termination, this is not a violation of his rights as a *member*. *See Toner v. United Bhd. of Carpenters*, No. 96 CIV 0023 SHS RLE, 1999 WL 638602, *7 (S.D.N.Y. Mar.30, 1999) (to prevail on this claim, plaintiff "must state a claim for a violation of [his] membership rights, not rights that may be vested in [his] official position."). An allegation that an "officer has been deprived of his rights as an officer" does not state a claim under the LMRDA. *Johnson v. Kay*, 860 F.2d 529, 536 (2d Cir.1988).

■ Thus, plaintiff's action may only be maintained if he falls within the Second Circuit's exception for deprivations of rights that are part of a overall scheme to suppress dissent or otherwise infringe union members' LMRDA rights within the union. As noted above, "an attack largely focusing upon a union officer may, under some circumstances, 'directly threaten the freedom of members to speak out,' and therefore violate the LMRDA, where 'as a result of established union history or articulated policy' there is 'a deliberate attempt by union officials to suppress dissent within the union.'" *Id.* (*quoting Cotter*, 753 F.2d at 229; *Schonfeld*, 477 F.2d at 904).

Critical to the Second Circuit decisions permitting a cause of action under the LMRDA, § 102 for infringement of officers' rights is the factual allegation of some chill on members' rights as part of the scheme to suppress dissent, which, if

true, would "demonstrate that [the officer's mistreatment] was not ad hoc personal retaliation but was part of a calculated and deliberate scheme to discourage dissent." *Maddalone*, 152 F.3d at 185; *see, e.g., id.* at 184–85 (dissident plaintiff's allegations that he was removed by opposing faction from position as shop steward pursuant to an order that every member who had participated in a certain protest demonstration should be removed from his job, where plaintiff "was the elected Vice President of the Local, ... was likely to send a powerful message to the rank-and-file members", and noting that plaintiff had alleged that supporters of opposing faction "often disrupted meetings and prevented opposition candidates from speaking to suppress criticism of his leadership within the union"); *Johnson*, 860 F.2d at 537 (upholding claim based on allegations of physical threats and attempts to disrupt meetings and block communications between the plaintiff union president and her supporters, which evidenced an "organized attempt[ ] by the defendants to prevent union members sympathetic to [plaintiff] from expressing their views"); *Newman v. Local 1101, Communications Workers of Am.*, 597 F.2d 833, 836 (2d Cir.1979) (upholding district court injunction ordering plaintiff reinstated as officer because purpose of plaintiff's removal was "to stifle not only [plaintiff] but members generally from exercising their rights openly to criticize the Local's management, to publish their views, and to run for office").

In *Johnson*, the Second Circuit found that plaintiff's complaint stated a claim upon which relief could be granted where plaintiff, a union president, alleged that the defendants, the union secretary-treasurer and members of the executive council, had engaged in physical intimidation of plaintiff and her supporters, disrupted meetings, seized the union headquarters, and prevented plaintiff from communicat-

ing with union members through ordinary channels prior to a vote on proposed constitutional amendments which would have given additional power to the executive council. 860 F.2d at 537. The court concluded that these acts "would strongly tend to chill union members who desired to exercise their rights in a fashion disapproved of by the [defendants'] faction" and therefore stated a claim under the LMRDA. *Id.; see also Cotter*, 753 F.2d at 229 (plaintiff's proof that his removal from office was part of an overall scheme to suppress dissent included history of past and present litigation between his dissident group and the union leadership created a genuine issue as to whether his removal "was not merely an isolated act of retaliation for political disloyalty but was part of a purposeful and deliberate attempt to suppress dissent within the union").

Here, unlike *Maddalone* and *Johnson*, plaintiff's complaint includes no allegations that supporters of the Reform slate were in any way "directly threaten[ed]" in the exercise of their rights. *See Cotter*, 753 F.2d at 229; *cf. Franza*, 869 F.2d at 47 ("Direct interference with Title I rights is required to state a cognizable § 102 claim."). Plaintiff cites, and this Court has found, no cases permitting an LMRDA, § 102 claim based solely on the infringement of an officer's rights without some concurrent allegation of facts showing a threat to members' rights.

Although there may be circumstances under which a reasonable inference of a deliberate attempt to suppress dissent within the union more broadly might be inferrable from a retaliatory attack on a union officer, *see, e.g., Franza*, 869 F.2d at 45 (noting that because a union officer may become a symbol for a movement within the union membership, the discipline of such an official could chill the union mem-

bership's Title I rights), this is not pleaded as such a case. Under the circumstances here, no reasonable inference that defendants' scheme had a tendency to chill or infringe members' democratic rights can be drawn from plaintiff's allegations. Unlike the union president in *Johnson,* plaintiff has not alleged facts of a scheme to frustrate union democracy by preventing the Reform Team from taking operational control of Local 1150, that, if credited, would support the conclusion that "the nature, intensity and extent of the defendants' scheme," 860 F.2d at 537, was such that the democratic rights of members who opposed the SantaMaria slate were chilled.

There are no allegations of any pre-election conduct by defendants known to the members, which might have suggested that the members would consider that supporting opposition to the SantaMaria slate was futile or risky. After the original election in November 1998, the postponement of Cederbaum's taking office, his relegation to an inferior office space, and the efforts to insulate the office staff from termination—all measures to aid defendants' planned attempt to regain power—certainly permit an inference of animosity by the SantaMaria holdover officers toward Cederbaum as the winning Reform officer. However, plaintiff's allegations indicate that defendants' scheme was only temporarily successful. Cederbaum was not prevented from eventually taking office, so the rank-and-file members were able to elect the candidate of their choice. He also was not prevented from carrying out his campaign promises to the members because he did ultimately terminate the office manager. The message thus conveyed to members from defendants' scheme was that eventually the Reform Team was victorious over the SantaMaria slate, from which no chill or infringement of members' rights can be inferred. Simi-

larly, the allegations of the defendants' scheme with Hoffa to overturn the election do not permit any inference that members' democratic rights were chilled by defendants' post-election conduct because a majority of these members voted, and again prevailed, against the SantaMaria slate in the re-run election in July 1999.

The facts alleged in the Amended Complaint, even if proved, simply do not permit a reasonable inference of a chill of union *members'* democratic rights, notwithstanding the alleged purpose of the scheme, namely to remain in office until Hoffa was installed as IBT General President and then gain his assistance to overturn the election results. *See* Amended Compl. ¶ 9. While plaintiff Cederbaum's allegations have made out the existence of a scheme, absent any allegations suggesting how that scheme chilled or tended to chill union members' democratic rights, the facts alleged by plaintiff do not permit the inference that this scheme had any tendency to suppress dissent or otherwise infringe rights, as required to state a LMRDA, § 102 violation. Instead, plaintiff's allegations evidence a scheme by the opposing, and unvictorious, slate to retain power and return to office. This type of political machination directed against an officer *qua* officer, with no alleged or inferrable effect on members' rights, does not violate the LMRDA.

Accordingly, Count Four is dismissed for failure to state a claim upon which relief can be granted.

## C. *State law claims*

Plaintiffs and defendants agree that the Court should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 if the Court dismisses plaintiffs' LMRDA claims against all defendants, and accord-

ingly Counts Two and Three are dismissed without prejudice.

**CONCLUSION**

For the reasons discussed above, defendants' motions to dismiss [Docs. ## 20, 22, 24] are GRANTED.

The Clerk is directed to close this case.

IT IS SO ORDERED.